(C. D. 1517)

SHELL OIL CO., INC.
A. W. SALTER & CO., INC. } *v.* UNITED STATES

United States Customs Court, First Division

(Decided April 15, 1953)

*Sharretts, Paley & Carter* (*Howard C. Carter* of counsel) for the plaintiffs.

*Charles J. Wagner,* Acting Assistant Attorney General (*Richard E. FitzGibbon,* special attorney), for the defendant.

Before GLIVER and MOLLISON, Judges

OLIVER, Chief Judge: This case concerns a commodity bearing the trade name "Teepol," which was classified under the provision for "esters of all kinds not specially provided for," in paragraph 37 of the Tariff Act of 1930, carrying a dutiable rate of 25 per centum ad valorem. Plaintiffs claim that the merchandise is classifiable under the provision in paragraph 80 of the Tariff Act of 1930 for "all other soap * * * not specially provided for," that carries a dutiable rate of 15 per centum ad valorem.

Of the 14 witnesses who appeared on behalf of plaintiffs, 9 testified by deposition under a duly authorized commission issued by this court. No consideration is given to their statements with reference to the use of "Teepol" in England, the place of manufacture and country of exportation. The use made of articles "of importation in foreign countries is no guide to their classification here." *H. Boker & Co. (Inc.)* v. *United States*, 19 C. C. P. A. (Customs) 27, T. D. 44870. The substance of the testimony of these witnesses is a description of the process of manufacture by the foreign exporter. The proof thus adduced can be summarized as follows:

Waxy materials, particularly residues from paraffin-wax manufacture, or waxes separated from petroleum refining, are subjected to intensive heat, cracking the substances into chemical elements (hydrocarbons), known as "olefins." By distillation, a selected cut or fraction—$C_8$ to $C_{18}$—of the olefins is obtained to form the base material for the ultimate product. These distilled olefins are reacted with sulfuric acid and then neutralized with caustic soda. The neutralized product is given an extractive treatment with a mixture of solvents, removing unreacted materials and undesirable impurities. Evaporation of the extracted product removes the solvents and concentrates the aqueous solution, producing the final product which is "Teepol," as offered to the market.

Plaintiffs' oral testimony, introduced by five witnesses, is a discussion of the chemical structure and properties of "Teepol," a comparison of its characteristics with those of a salt and an ester, and an explanation of the use and final disposition of the imported product. Analysis of the testimony of each of those witnesses follows.

Merle L. Griffin, employed by the United States seller of "Teepol," testified that between the period from October 1944 to February 1946, approximately 1,210,000 pounds of the imported merchandise were sold, of which 1,160,000 pounds were purchased by Proctor & Gamble, manufacturer of soaps, shampoo, and related products. Five other companies purchased smaller quantities, in different amounts to equal the aggregate sold.

Isaac M. Koch, associated with Proctor & Gamble as a chemical supervisor, directing manufacturing operations to see that formulas

are maintained and specifications for the finished products are met, testified that the merchandise in question was used in the manufacture of "Drene," a shampoo, and in the production of "Dreft," that is ordinarily used "for general household purposes," and occasionally as a shampoo. It should be emphasized that such use of "Teepol" was limited to the period "beginning December 1944 and for the months of January, February, March, April, 1945." In both of the said products, "Teepol," as an ingredient thereof, was used as a detergent. The demand for the merchandise under consideration developed when it became difficult to obtain "lauryl alcohol," a fatty alcohol that had been previously used. That such use must have been extremely limited, if not entirely an emergency use, is clear from the following disclosure by the witness:

* * * At Proctor & Gamble we do not make Dreft at the present time, we did but we do not now, and when I last supervised the manufacture of that product, we were using a fatty alcohol sulfated with sulfuric acid and to that you add a phosphate and of course, water, after it has been neutralized with an alkali and in the manufacture of Drene we used a fatty alcohol which was sulfated to lauryl sulfuric acid to which we used triothanolamine and water.

No reason was given for discontinuing the use of the imported product in question.

Willem Leendert Johannes De Nie, an eminently qualified chemist, connected with the Product Development Department of the Shell Chemical Corp., supplied details concerning the chemical behavior of the product under consideration. Based on personal observation of the manufacture of "Teepol," the witness described its production as follows:

You take a slack-wax as a by-product of lube oil which is cracked at high temperature. This pyrolysis then produces olefins. These olefins are hydrocarbons which are properly selected for the purpose and then reacted with strong sulfuric acid neutralized with alkali, and brought up to the specifications as we have it for the sales of our Teepol.

After giving the chemical structure of "Teepol" as "sodium salt with a strong acid," and stating that the combination is indicative of soap, the witness testified at considerable length, comparing the chemical characteristics found in an ester, in sodium salt (soap), and in "Teepol." Convenient presentation of this line of testimony is set forth in tabulated form in plaintiffs' brief from which the following is taken:

| Characteristic | Sodium salt | Ester | Teepol |
|---|---|---|---|
| Products reacted | Strong base and strong acid | Alcohol and acid | Strong base and strong acid |
| Time of formation reaction | Instantaneous | Not instantaneous | Instantaneous |
| Reversibility of formation reaction | Not reversible | Reversible | Not reversible |

| Characteristic | Sodium Salt | Ester | Teepol |
|---|---|---|---|
| Ionization in solution | Strongly ionized | Not ionized | Highly ionized |
| Type of valence bonds | Electro-valent | Co-valent | Electro-valent |
| Conductivity | Conductive | Non-conductive | Conductive |
| Solubility in water | Soluble | Non-soluble | Soluble |

Based upon the similarities and differences, as hereinabove enumerated, the witness concluded that "Teepol" has the main characteristics of a salt, and not of an ester. He stated that "Teepol" is not a soap, but a synthetic detergent, and explained "detergency" to be "the power to get any foreign particle off a surface, probably a cloth, and to free that surface from that particle and to clean it in that way." Identifying other properties of "Teepol," the witness testified that it has "dispersion power," through which it will "advert small particles being suspended to fluctuate and form larger particles and usually settle"; that it will emulsify any particle that is insoluble in water; that it has wetting properties; and that it will lower interfacial tension, i. e., reduce the inherent difficulty of piercing itself into another medium. All of these characteristics are included within the witness' broad understanding of the term "soap," stated as follows:

Well, the term soap has broadened in its significance in my opinion over the last couple of ages. Previously soap was a solid or semi-solid material used for washing. Later on with the technical development liquid soaps became generally accepted to come within the term of soap. About 1910 there was not another word devised to make it clear that you were talking about liquid soap rather than bar soap. Over the last ten years other materials have been developed which would carry out the action of soap in practically all cases where soap does and in some cases even better. These products are either referred to in literature as soap or as synthetic detergents. There is no unanimous opinion about it but it is my personal feeling that they will go, the same way as liquid soap and in the final analysis they will be grouped under the same heading as soap.

On cross-examination, the witness testified that "Teepol" is a synthetic detergent, and that soap is not such a product. Further testimony showed that "Teepol" is not made in the United States, that it is not imported, and that its use is confined to foreign countries.

Foster D. Snell, a consulting chemist and chemical engineer, described "Teepol" as a liquid which looks much like any liquid soap, except for its lighter color. He identified it as a solution of 10 per centum active material—sodium salt of a second alkyl sulfuric acid—and characterized it chemically as a salt with "an ester grouping which is unimportant to its main properties." This witness' testimony is largely a corroboration of the previous witness' statements concerning comparative characteristics of an ester, soap, and the merchandise in question, and an identification of the detergent properties of "Teepol." Replying to the question, "What physical characteristics do you associate with soap?", the witness stated:

Well, all kinds of soaps, you may have a bar soap which is like your toilet soap which you use at home; a bar of floating soap, which is characteristic of Ivory.

You may have a liquid soap which is a potassium salt of a fatty acid derived from a soft oil such as used in liquid hand soap. You may have various compounds which are sold as soaps and which contain pine oil, borax, almost anything including cresylic acid if they are soaps at the same time to give germicidal properties. You have soaps which are not even miscible with water such as those sold as dry cleaner soaps, potassium soaps in petrol solvents used for mixing with other petroleum solvents with the dry-cleaning trade. Soaps are very heterogeneous.

In further testimony, the witness stated that "there isn't any characteristic that you can say obtains in all soaps," and then added that "Teepol," in common with soaps, has "the very important characteristic of being a detergent."

Frederick W. Hannsgen, Jr., a chemist employed by a subsidiary of the plaintiff corporation, testified that his experience with "Teepol" began in 1943 or 1944 when he evaluated a sample "for detergency, wetting and various other associated qualities." His testimony with respect to the chemical reactions of an ester, a salt, and the imported product under consideration, as well as statements concerning the properties of "Teepol," agrees with proof along the same line elicited from plaintiffs' previous witnesses. He stated that "the salt characteristic" is predominant in "Teepol," and that the characteristics of an ester, also found in the product, are relatively weak. His characterization of the merchandise as a salt follows a customary practice of determining the predominant functional group and classifying the substance along that line. Cross-examination obtained the admission that you could say "Teepol" is a salt, and you could say it is an ester. The witness regards all soaps as detergents; in other words, the terms are synonymous. The statement is a contradiction of previous testimony offered by plaintiffs, hereinabove set forth.

Defendant's testimony, while somewhat contradictory to that presented by plaintiffs, offers a clarification, helpful to a positive finding with respect to the kind or class of merchandise in question. Following is a review of the testimony offered by each of the four witnesses who appeared on behalf of the defendant.

John Ross, a chemist employed since 1935 by the Colgate-Palmolive-Peet Co., manufacturer and seller of soaps and synthetic detergents in the industrial and household package field, acquired familiarity with "Teepol" in 1944 when he examined a sample from England, represented to be the same as the product ordinarily sold under that trade name in the foreign country. The material was a solid, unmixed with water or anything, and consisted of a white, granular powder, containing some 35 per centum of active ingredients. Chemical analysis of the merchandise revealed it to be "the sodium salt of a secondary alkyl sulfate," which he considers is a salt and an ester, but not a soap within his understanding of the term that he defined as "the sodium of potassium salt of a fatty acid, usually made from fatty oils."

A highly important phase of this witness' testimony concerns the presence of the ester group. He testified as follows:

R X Q. So that the ester group is not essential to the surface activeness of an agent?—A. The ester group is very essential to Teepol.

R X Q. Why do you say that?—A. Because it holds it together. It holds the sulfuric acid to the hydrocarbon.

The testimony just quoted is a direct contradiction to plaintiffs' proof to the effect that the ester characteristics of the present merchandise are comparatively weak and unimportant to its principal properties.

Testimony of Alvin J. Frantz, employed as a chemist by the said Colgate-Palmolive-Peet Co., and Charles P. Neidig, chemical engineer associated with the Atlantic Refining Co., whose activities include the production of synthetic detergents from petroleum, is in agreement with an opinion expressed by plaintiffs' witness, De Nie, stating that "Teepol" is a synthetic detergent and not a soap.

Herbert W. Eckweiler, concededly a qualified chemist employed in the United States Customs Laboratory at New York, based his testimony on his own analysis of the merchandise in question, illustrative exhibit 2, and stated that the product under consideration consists chiefly of ester salts which he defined as chemical compounds having "both the functions of an ester and the functions of a salt," that the ester salts were not produced separately and then mixed but resulted from a chemical reaction. His conclusion was that "Teepol" is not a soap.

On the record as hereinabove outlined, we find that the merchandise in question has the characteristics of a salt and also those of an ester. Although plaintiffs' proof includes a statement that the "salt characteristic" is predominant, the ester group is equally essential, as disclosed by defendant's witness, Ross, whose testimony contains the statement that "Teepol," without the ester group "would be non-existent. You would have nothing."

"Teepol," however, is more than an ester. It is a commodity, resulting from several operations, involving chemical adjustments and reactions, and employing a variety of materials. The series of processes produces a manufactured product, possessing a combination of different chemical characteristics that impart properties peculiar to "Teepol," the finished article. The collector's classification under paragraph 37, *supra*, as an ester, not specially provided for, is therefore overruled.

Counsel for plaintiffs, in their brief, cite two cases in which merchandise was held to be classifiable as soap. *Andreykovicz & Dunk* v. *United States*, 8 Treas. Dec. 825, T. D. 25912, and *Park & Tilford* v. *United States*, 1 Treas. Dec. 1107, T. D. 21234. In both cases, the merchandise was concededly soap, the sole question being whether in the form of importation it was classifiable within the provision for

"all other soaps not specially provided for." Neither of the citations have any influence toward a proper determination of the present issue.

To support their claim for classification of the merchandise in question as soap, plaintiffs rely on the common meaning of the term. Accordingly, counsel, in their brief, quote the following definition:

Webster's New International Dictionary, Second Edition 1935:

soap n. 1. A cleansing agent, made usually by action of alkali on fat or fat acids, and consisting essentially of sodium or potassium salts of fat acids. * * * In making COMMON YELLOW OR ROSIN SOAP, THE ROSIN WHICH IS SUBSTITUTED IN PART FOR THE FAT, is added and neutralized (rosin change), or is added already neutralized, before boiling for strength. * * * The cleansing action of soap is due especially to its power to emulsify grease and mechanically held dirt and to wet and penetrate into oily surfaces. 2. Chem. By extension, any salt of one of the fat acids; * * * . Calcium soaps (lime soaps) and magnesium soaps form as a curd when ordinary soap is used in hard water. * * * (Capitals added.)

Funk and Wagnalls New Standard Dictionary defines the noun, "soap," as "Any compound formed by the union of a fatty acid with a base; specif., a substance consisting wholly or in part of a sodium or potassium salt of oleic, palmitic, or stearic acid, and used as a detergent."

Arguing along the same line, counsel for plaintiffs, in their brief, refer to the Encyclopaedia Britannica, and call attention to the following information contained therein:

SOAP usually defined as a chemical compound or mixture of chemical compounds resulting from the interaction of fatty oils and fats with alkali, i. e., the salts of fatty acids. Functionally, soap is a substance possessing the characteristic "soap-like" properties of sudsing, detergency, surface tension lowering, wetting and emulsifying power, curd and gel formation. Modern research has led to the view that these properties may be attained by inserting strongly polar (water-soluble) groups into a wide variety of long chain molecules (Rideal). Since 1930 many such long chain substances, some of them bearing no relation to the fats, have been developed, and some of them, e. g., sulphated alcohols, sulphonates, sulpho-acetates, etc., are of definite commercial importance in the field of soaps. While usage of the term has not yet crystallized, the functional consideration of soap brings within its scope these newer modern detergents and, at the same time, excludes the water-insoluble compounds of fatty acids with the bases of calcium, iron, aluminum, etc. These latter are better termed "metallic soaps." [Italics added.]

In the same volume (vol. 20) of the Encyclopaedia Britannica, under the general heading, "Soap Products," is included the following:

(i) New Detergents.—As was pointed out earlier in this article, there are many long chain compounds with polar groups which possess soap-like properties. Some of these, like the "inverted soaps" (triethyl cetyl ammonium iodide) discovered by Reychler, and the "hydrogen soap" (cetyl sulphonic acid) of McBain have been known for many years, but only since 1930 has practical application of similar discoveries led to commercial products. It is impossible to discuss the wide variety of substances, patented and unpatented, which have been suggested for use in the detergent field. Many of the materials, in addition to the usual soap

properties (*e. g.*, phase behaviour) have certain unique characteristics enabling them to replace or supplement the salts of fatty acids. * * *

The foregoing extracts from the Encyclopaedia Britannica, discussing different phases of "soap," and products made therefrom, do not adhere to the common meaning of "soap," as quoted from the cited dictionaries, but, on the contrary, they present an extended interpretation pointing to some future recognition of a wider acceptation of the term.

The present record, however, does not provide a sufficient basis to invoke such a construction. "Teepol," the merchandise under consideration, has had extremely narrow and limited usage. Plaintiffs' proof shows that the commodity was used for no longer than a period of 5 months, and then, under war conditions when it was employed as a substitute for a fatty alcohol that could not be obtained at the time. Whether "Teepol" failed to meet a definite standard, or was entirely unsatisfactory, as an ingredient in the products where used, is not disclosed by the record. Plaintiffs admit that the merchandise is not used in this country at the present time; in fact, it is not imported. The emergency use of the product and later elimination thereof as an article of commerce in this country are unfavorable to plaintiffs' claim.

The vague and rather uncertain status of the merchandise in question in industry, as disclosed by plaintiffs' proof, will not permit definite classification of the product as soap under paragraph 80, *supra*. Plaintiffs' claim is, therefore, overruled.

The merchandise in question, being a manufactured commodity, as hereinabove set forth, and not being specifically provided for in the tariff act, the product finds classification under paragraph 1558 of the Tariff Act of 1930 as a nonenumerated manufactured article. Since, however, that claim is not alleged by plaintiffs, the protest must be and hereby is overruled, without affirming the action of the collector. Judgment will be rendered accordingly.